CRAWLEY, Judge.
In September 1996, the State Department of Human Resources (“DHR”) petitioned to terminate the parental rights of J.B. (the “father”) and W.N. (the “mother”), the natural parents of T.E.B. (the “child”). After a hearing, the trial court terminated both the mother’s and the father’s parental rights. The father appeals. After careful consideration of the evidence presented at the hearing, we affirm the termination of the father’s parental rights.
“The right to maintain family integrity is a fundamental right protected by the due process requirements of the Constitution. Pursuant to this right, Alabama courts recognize a presumption that parental custody will be in the best interests of a child. This prima facie right of a parent to the custody of his or her child can only be overcome by clear and convincing evidence that permanent removal from the parent’s custody would be in the child’s best interest.... In making that determination, the court must consider whether the parent is physically, financially, and mentally able to care for the child. If the court finds from clear and convincing evidence that the parent is unable or unwilling to discharge his or her responsibilities to and for the child, his or her parental rights can then be terminated, pursuant to [Ala.Code 1975,] § 26-18-7(a)....”
Bowman v. State Dep’t of Human Resources, 534 So.2d 304, 305 (Ala.Civ.App.1988) (citations omitted). The trial court’s decision to terminate parental rights, which is based on evidence presented ore tenus, is presumed correct and will be reversed only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. R.B. v. State Dep’t of Human Resources, 669 So.2d 187 (Ala.Civ.App. 1995).
To terminate parental rights, the trial court must first determine from clear and convincing evidence that the child is dependent. S.F. v. Department of Human Resources, 680 So.2d 346 (Ala.Civ.App.1996). The trial court must then determine that there exists no alternative to termination. L.A.G. v. State Dep’t of Human Resources, 681 So.2d 596 (Ala.Civ.App.1996).
A trial court may terminate parental rights when “the parents of [the] child are unable or unwilling to discharge their responsibilities to and for the child, or ... the conduct or condition of the parents is such as to render them unable to properly care for the child and ... such conduct or condition is unlikely to change in the foreseeable future.” Ala.Code 1975, § 26-18-7(a). In making the difficult decision to terminate parental rights, the trial court is required to consider, among *1293 other things, the excessive use or abuse of alcohol by a parent, id., conviction of and imprisonment for a felony, Ala.Code 1975, § 26 — 18—7(a)(4), and whether “reasonable efforts by [DHR] ... leading toward the rehabilitation of the parents have failed.” Ala. Code 1975, § 26-18-7(a)(6). In addition, in cases like this one, where the child is no longer in the physical custody of the parents, the trial court must also consider the “[l]ack of effort by the parent to adjust his circumstances to meet the needs of the child in accordance with agreements reached ... with [DHR].” Ala.Code 1975, § 26-18-7(b)(4).
The testimony and other evidence at trial focused on the ability of the parents to meet the needs of the child and whether the parents had, in accordance with DHR service plans, taken steps to rehabilitate themselves so as to adjust their circumstances to better provide for the child. The evidence established that the father had a history of alcohol abuse and an extensive criminal record. In addition, the evidence showed that the father was not receptive to efforts at rehabilitation made by DHR and that the father failed to complete or meet the goals outlined by DHR in the service plan.
The child is a special needs child. When he entered foster care, he was developmentally delayed. At the age of four, he could not dress himself or use eating utensils. He has made significant improvements in foster care, but no decision had been made on whether his delayed development was caused by environmental factors. He has also been diagnosed with attention deficit hyperactivity disorder (ADHD). In addition, he suffers from other behavioral problems, including acting out sexually.
In August 1994, the child was removed from the custody of his parents when the father was arrested for driving while under the influence of alcohol (DUI) with the child in the car. The legal custody of the child was placed in DHR. After an unsuccessful placement with a family resource, the child was placed in foster care in November 1994.
In October 1995, the father was ordered to meet with a court referral officer, Gerald Fields, for placement in an alcohol abuse treatment program. Mr. Fields testified that the father did meet with him as required by the court order; however, he testified that the father denied that he needed treatment for his abuse of alcohol. Mr. Fields testified that he referred the father to Quest Recovery Center (“Quest”), which administers an alcohol abuse treatment program. He also testified that the father was instructed to visit the court referral office once a month for six months for monitoring.
Mr. Fields further testified that the father failed to complete the outpatient program at Quest and that he also failed to revisit the court referral office. He testified that, after the father failed to complete the Quest program, he contacted the father by letter, recommending that the father make an appointment to see him about resuming treatment. According to Mr. Fields, the father wrote a letter in response, stating that he could not afford the outpatient treatment program at Quest and that, because he could not attend Quest, he saw no reason to meet with Mr. Fields. Mr. Fields testified that he made no further effort to contact the father.
Louis Joseph Namie, a substance abuse counselor at Quest, testified that he had counseled the father during his treatment in the Quest program. According to Mr. Na-mie, the father was diagnosed with alcohol dependency with early partial remission. Mr. Namie stated that the father’s treatment program was considered an intensive outpatient group treatment. He testified that the father was required to attend group therapy sessions three times per week and that the sessions lasted approximately four hours each. In addition, he testified that the father was to seek individual counseling as necessary and to attend Alcoholics Anonymous (AA) meetings twice a week. According to Mr. Namie, the father attended 5 therapy sessions, but missed 11. Mr. Namie testified that the father was terminated from the program in November 1995 for nonattendance. He further testified that the father reentered the program in February 1996, but that he attended only 8 sessions and missed 10 before being terminated from the program again. Mr. Namie testified that the father did not attend AA and had not sought an AA *1294 sponsor during his treatment. He testified that he had concluded that the father had his priorities elsewhere and not on recovery from alcohol dependency.
Although Mr. Namie testified that he did not handle financial arrangements at Quest, he stated that Quest did not turn away clients for nonpayment and that arrangements could be made for those persons experiencing financial difficulties. In fact, the records from Quest show that the father was charged $82 per session for three sessions per week, for a total of $96 per week for the October-November 1995 treatment sessions; however, the records also show that he was required to pay Quest only $50 per month on his balance. In addition, the records show that the father was charged only $8 per session, for a total of $24 per week for his treatment sessions in February 1996.
The DHR caseworker, Melinda Adams, testified at length concerning her involvement in attempts at rehabilitating the father. She testified that she discovered through interviews with the father that he “lived” with his mother, but that he was truly a transient with no real home. She testified that the father had an alcohol abuse problem and that he had been incarcerated several times. She further testified that the relationship between the father and the mother was unstable and that the father had professed concern about the mother’s ability to adequately supervise the child. She testified that they had discussed the need for him to stabilize his life; however, she commented that he was defensive about his drinking problem and that he denied that he needed help.
Ms. Adams testified that she developed a service plan for the father, which he signed in September 1995. That service plan required the father (1) to accept responsibility for alcoholism and to participate in and successfully complete a treatment program; (2) to maintain sobriety and attend AA meetings as recommended by the treatment facility; (3) to maintain a stable residence in one location; and (4) to have regular and appropriate visitation with the child. According to Ms. Adams, the father failed to meet these goals.
She testified that the father was not receptive to the services offered by DHR. She further testified that the father had indicated that he was financially unable to pay the costs of the Quest program. However, she stated that he also told her that the program “shot his day” and that he did not have time to do anything else when he attended the Quest program.
Ms. Adams testified that she was concerned about the father’s lack of stability. She testified that he could be reached through his mother, but that he often stayed with friends or in his van. She further testified that the father and the mother had been living together in a trailer, but that they were evicted in August 1996. She also testified that the father’s relationships lacked stability. According to Ms. Adams, the father and the mother fought often and their fighting resulted in an on-again-off-again relationship. She said that the father remarried his former wife in October 1995, when only one month before he had told her he was working on his relationship with the mother. She testified that he later left his wife, whom he did not divorce, and again resumed his relationship with the mother.
Ms. Adams also testified about her attempts to find alternative placement for the child. Despite her attempts at placing the child with a relative resource, she was unable to find anyone in the father’s family or the mother’s family willing to take responsibility for the child. Two of the father’s sisters were interested in taking the child, but changed their minds before placement was achieved.
The father admitted that he had had 13 DUI convictions and that he had had an alcohol problem in the past. He denied having a problem with alcohol at the time of the hearing and insisted that he was maintaining sobriety and attending AA meetings when he needed to do so. He testified that he had not received a DUI conviction since the one in 1994 that resulted in the removal of the child. He also testified that he had attended AA meetings while in prison, during his incarceration between November 1994 and August 1995 on a probation violation.
*1295 He further testified that he could not afford the treatment at Quest, which he said cost $104 per week. He testified that he usually receives $871 in Supplemental Security Income, but that the amount was reduced to $571 in 1996 because he had continued to receive benefits while he was in prison in 1995. According to the father, he notified someone at Quest that he was unable to pay the $104 per week, but he said he was not told that payments could be adjusted based on his income.
The father testified that he was not evicted from the trailer in which he and the mother were residing. He explained that the owner of the trailer park in which they lived had requested that they move out of the trailer because of some problems with fighting and an accusation that the mother had set fire to the bed in which the father was sleeping. He said that he had agreed to move out until things settled down.
When questioned about the mother’s attempt to set the bed on fire, the father stated that he did not think she would do it again and that she would not have done it had the child been in the trailer. The father also admitted that he had hit the mother in the past and that he had hit the mother in the presence of the child. According to the father, the last time he hit the mother was “a pretty good while back.” In response to the question “Would you ever [hit the mother] again?” he replied, “I hope I never have to.”
According to the father, he stayed at a friend’s home and then at his mother’s home after leaving the trailer park. He said that he and the mother had since reconciled. At the hearing, he stated that he was living with the mother in another trailer park.
The father testified that his driver’s license was suspended, but he admitted that he drove to the hearing. He also testified that, if he were awarded custody of the child, he would drive if he needed to take the child somewhere. He testified that he had two pending indictments, one for burglary and one for arson, based on incidents that occurred in 1994. When questioned about the possibility that he may be incarcerated as a result of those indictments, he testified that he would make suitable arrangements for the child’s care if he were imprisoned.
The father argues that DHR did not present clear and convincing evidence that termination of his parental interests was warranted. We disagree. The evidence presented supports the trial court’s decision to terminate the father’s parental rights. The father is an admitted alcoholic who will not seek appropriate treatment despite his desire to retain custody of his child. He is unable to maintain a stable home. He has also continued his violent relationship with the child’s mother, despite his own concerns that she is unable to provide proper care and supervision for the child.
The father argues that DHR is using his poverty as a reason to terminate his parental rights. Although we are mindful of the father’s insistence that mere poverty should not be used as a reason to terminate the rights of those that are good and loving parents, our review of the evidence in this case reassures us that DHR and the trial court had clear and convincing evidence that the father’s “conduct or condition is such as to render [him] unable to properly care for the child and ... [that] such conduct or condition is unlikely to change in the foreseeable future.” See § 26-18-7(a).
Finally, the father urges this court not to hold his history of alcohol abuse and criminal behavior against him. We agree that people can change and can rise above their past behavior. However, the father failed to prove that he is able to change. He has not met the goals outlined in his service plan; that is, he did not successfully complete a treatment program and he has not maintained a stable home. He has failed to adjust his circumstances to meet the needs of his child. See § 26-18-7(b)(4). Therefore, we affirm the termination of the father’s parental rights.
AFFIRMED.
ROBERTSON, P.J., and YATES, MONROE, and THOMPSON, JJ., concur.