[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 263 
This is a termination-of-parental-rights case involving three children, K.J., a female who was born in April 1997; J.A., a female who was born in July 1999; and J.J., a male who was born in June 2002. A.A., who was approximately 26 years old at the time of trial, is the mother of K.J., J.A., and J.J.[1]
R.A., who was approximately 27 years old at the time of trial, is the father of J.A.R.A. and A.A. are married, but they separated in 2001 and they do not reside together. R.A. is from Tanzania, and he is not a United States citizen.
M.J., who was approximately 33 years old at the time of trial and who is from Nepal, is the father of K.J. and J.J.A.A. resided with M.J. on an intermittent basis for several years preceding trial.
In April 2002, a few weeks after A.A. had attempted to sell one of her other children, see note 1, supra, the Cleburne County Department of Human Resources ("DHR") obtained custody of K.J. and J.A. based on a domestic-violence incident between A.A. and M.J.[2] DHR obtained custody of J.J. in June 2002, a few days after he was born. K.J., J.A., and J.J. were placed in the same foster-care home on June 17, 2002, where they resided at the time of trial.
In July 2003, after its efforts to reunify the children with their respective parents had failed, DHR filed a petition to terminate the parental rights of A.A. and R.A. to J.A. and to terminate the parental rights of A.A. and M.J. to K.J. and J.J. After a two-day ore tenus proceeding conducted on January 8, 2004, and January 12, 2004, the juvenile court rendered judgments terminating the respective parents' parental rights to K.J., J.A., and J.J. The judgments were entered on February 24, 2004. In the judgments, in addition to making specific findings regarding the respective parents' inability and unwillingness *Page 264 
to assume and fulfill their parental obligations to the children, the juvenile court determined (1) that DHR made "reasonable efforts in its attempt to reunify the subject child[ren] with [the parents] and those efforts have failed" and (2) that "[n]o viable alternative to termination of parental rights exists and termination of parental rights is in the best interest of the [children]."
A.A., R.A., and M.J. filed postjudgment motions, which were denied by operation of law. A.A., R.A., and M.J. appealed. We consolidated the appeals, ex mero motu. The juvenile court has certified the record in accordance with Rule 28(A)(1)(a), Ala. R. Juv. P.
 A.A.'s Appeal (case no. 2030642)
A.A. contends that the juvenile court erred by terminating her parental rights because, she says, DHR failed to establish that no viable alternative existed to the termination of her parental rights. A.A. argues that the children should have been placed in the custody of her brother, B.R., and his wife, C.R.A.A. also mentions the children's maternal grandparents as a possible placement alternative, but her argument is primarily directed to a potential placement with B.R. and C.R.
When a trial court's decision to terminate parental rights is based on evidence presented ore tenus, we will presume that the judgment is factually correct and will reverse the trial court only if the record demonstrates that the decision is unsupported by the evidence and is plainly and palpably wrong. M.H.J. v.State Dep't of Human Res., 785 So.2d 372 (Ala.Civ.App. 2000).
 "This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. `In child custody cases especially, the perception of an attentive trial judge is of great importance.'"
Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001) (quotingWilliams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App. 1981)). Also, this court "will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous." Ex parte Bryowsky,676 So.2d 1322, 1324 (Ala. 1996); see also FitznerPontiac-Buick-Cadillac, Inc. v. Perkins Assocs., Inc.,578 So.2d 1061, 1063 (Ala. 1991).
As in all child-custody cases, we must evaluate the merits of A.A.'s appeal in light of the controlling consideration of the best interest of the children. Smith v. State Dep't of Pensions Sec., 340 So.2d 34, 36 (Ala.Civ.App. 1976). "[T]he polestar of all child custody cases is the best interest and welfare of the child." Barbour v. State Dep't of Pensions Sec.,367 So.2d 470, 472 (Ala.Civ.App. 1978).
 "Although a parent has a prima facie right to the custody of his or her child, this right can be overcome by clear and convincing evidence that the child's best interests would be served by removing the child from the parent's custody. . . . In determining the child's best interests, the trial court must consider whether a party to a custody proceeding is physically, financially, and mentally able to care for the child. . . . If clear and convincing evidence demonstrates that the party cannot, or is unwilling to, fulfill these responsibilities, then parental rights may be terminated. § 26-18-7, Ala. Code 1975."
V.M. v. State Dep't of Human Res., 710 So.2d 915, 919
(Ala.Civ.App. 1998); see also Santosky v. Kramer, 455 U.S. 745,766-67, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). *Page 265 
In Ex parte Beasley, 564 So.2d 950 (Ala. 1990), our Supreme Court stated:
 "The two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in [Ala. Code 1975,] § 26-18-7. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered. ([In addition], if a nonparent, including the State, is the petitioner, then such a petitioner must meet the further threshold proof of dependency.)
 "Once the court has complied with this two-prong test — that is, once it has determined that the petitioner has met the statutory burden of proof and that, having considered and rejected other alternatives, a termination of parental rights is in the best interest of the child — it can order the termination of parental rights."
Ex parte Beasley, 564 So.2d at 954-55 (emphasis added). See Exparte State Dep't of Human Res., 624 So.2d 589, 592-93 (Ala. 1993) (applying Ex parte Beasley); see also Ala. Code 1975, § 12-15-71(a).
The 1984 Child Protection Act, Ala. Code 1975, § 26-18-1 et seq. ("the CPA"), provides, in pertinent part, that a court may terminate parental rights
 "[i]f the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future."
Ala. Code 1975, § 26-18-7(a). In determining whether DHR has proven by clear and convincing evidence that a parent is unable or unwilling to discharge his or her responsibilities, the CPA requires that the court consider several factors, including, but not limited to, the following:
 "(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
 "(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
 ". . . .
 "(6) That reasonable efforts by the Department of Human Resources . . . leading toward the rehabilitation of the parents have failed."
Ala. Code 1975, § 26-18-7(a); see also Ala. Code 1975, § 12-15-65(m); J.B. v. State Dep't of Human Res., 709 So.2d 1291
(Ala.Civ.App. 1998).
Under the CPA, "abandonment" is defined as:
 "A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the *Page 266 
parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
Ala. Code 1975, § 26-18-3(1). Subsection (c) of § 26-18-7 states that "[i]n any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents."
When a child is not in the physical custody of a parent, the trial court must also consider, among other things, the following:
 "(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by [DHR] . . . and agreed to by the parent.
 "(3) Failure by the parents to maintain consistent contact or communication with the child.
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources . . ., in an administrative review or a judicial review."
Ala. Code 1975, § 26-18-7(b).
Subsections (a) and (b) of § 26-18-7 further provide that a trial court may consider factors other than those set forth in those subsections in determining whether to terminate a parent's parental rights. See, e.g., Brown v. Alabama Dep't of Pensions Sec., 473 So.2d 533, 534 (Ala.Civ.App. 1985) (The CPA "enumerates only some of the many factors this court has long taken into consideration in making determinations concerning the termination of parental rights.").
A.A. does not contend that she was able or willing to discharge her parental responsibilities to and for K.J., J.A., and J.J. or that her ability or willingness to discharge her responsibilities for her children would likely change in the foreseeable future. However, we believe that it is necessary to review the evidence regarding A.A.'s parenting skills, or lack thereof, as a background for considering her arguments regarding the secondBeasley prong. In regard to A.A.'s inability and unwillingness to fulfill her parental responsibilities, the juvenile court specifically determined that A.A. had a history of alcohol abuse, that she became "violent, out of control, and a danger to herself and others" when she drank alcohol, and that her alcohol abuse "led to her children being placed in foster care in April 2002." Those findings are supported by the evidence.
The juvenile court also noted that A.A., who had been incarcerated for a few months before trial and who was incarcerated on the first day of trial, failed to attend the second day of the trial even though she was no longer incarcerated; the record would support a finding that A.A. was aware of the trial. Also, the record would support a finding that in February 2002, two months before DHR obtained custody of K.J. and J.A., A.A. attempted to sell one of her other children to two strangers for $10; that child was 18 months old at the time.See note 1, supra. According to M.J., the mother was convicted of "something like reckless conduct" for her attempt to sell the child.[3] *Page 267 
The record supports the juvenile court's determination that after DHR obtained custody of the K.J., J.A., and J.J., it made reasonable efforts to rehabilitate A.A. so that she could be reunified with the children but that A.A. was uncooperative with DHR's rehabilitation efforts. The record would support findings that K.J., J.A., and J.J. were removed from A.A.'s custody based, in part, on her alcohol abuse and her pattern of domestic violence involving M.J. Based on M.J.'s testimony, it also appears that A.A. abused marijuana and cocaine. Further, the record would support a finding that A.A. repeatedly committed domestic violence against M.J. in the presence of the children, that K.J. and J.A. had "chronically" witnessed sexual encounters between A.A. and M.J., and that "domestic violence and substance abuse were big issues in the family." It was undisputed that the domestic violence by A.A. against M.J. continued after the children were removed from her custody. Darlene Davis, K.J.'s and J.A.'s licensed professional counselor, testified regarding the negative impact that A.A.'s and M.J.'s conduct had had on K.J. and J.A., who would often hide in a closet during the altercations. Also, according to Davis, she had observed nothing which would indicate that the children had any attachment to A.A.; instead, Davis testified, "The talk that they've had about their mom has been being very fearful of her."
Between January 2003 and June 2003, before DHR filed its petition to terminate A.A.'s parental rights, A.A. failed to visit with the children on 70 of 72 visitation opportunities. Between June 2003 and December 2003, A.A. failed to visit with the children on 10 of 12 visitation opportunities; A.A. was incarcerated in November 2003 after she violated the terms of her parole, and she was not released from jail until after the first day of trial.
In light of the foregoing, it is understandable why A.A.'s contentions are limited to the second prong of the two-prong test that our courts apply in termination-of-parental-rights proceedings. However, we need not ignore A.A.'s irremediable parental unfitness when considering whether the second prong ofBeasley has been satisfied. See D.M.P. v. State Dep't of HumanRes., 871 So.2d 77 (Ala.Civ.App. 2003) (plurality opinion);J.B. v. Jefferson County Dep't of Human Res., 869 So.2d 475
(Ala.Civ.App. 2003) (plurality opinion). In light of the foregoing background information regarding A.A., we must now consider whether DHR met its burden of proving, by clear and convincing evidence, that the termination of A.A.'s parental rights would be in the best interest of the children at issue.
Initially, at trial, A.A. apparently intended to argue that the children's maternal grandparents, who resided in Georgia and who had custody of two of A.A.'s other children, see note 1,supra, were a viable alternative custody placement for K.J., J.A., and J.J.[4] The maternal grandparents attended trial, and A.A. and the children's guardian ad litem indicated that they intended to call the maternal grandparents as witnesses. However, neither maternal grandparent testified. Instead, Shawna Dodson, a DHR caseworker assigned to K.J.'s, J.A.'s, and J.J.'s cases, testified, without objection, that A.A. had informed her that she was
 "just like her father. She described an extensive alcohol abuse history for both *Page 268 
of her parents and violent behaviors that she had witnessed from her father to her mother. . . . [S]he also stated that they didn't drink as much and they didn't take as many pills now but that they were better grandparents than they were parents."
Also, R.A. testified that one of A.A.'s friends, who apparently strongly influenced A.A.'s alcohol and drug abuse, died of a drug overdose while in the maternal grandparents' home; A.A.'s two children who resided with the maternal grandparents were present in the home at the time.
Dodson testified that in September 2003 the Georgia Department of Family and Children Services ("DFACS") had, after investigation, denied the maternal grandparents' request to be considered as a relative placement for another of A.A.'s children, Ro.A. See note 1, supra.[5] The denial was based, in part, on the maternal grandfather's refusal to authorize a criminal background check. The maternal grandmother had also resisted efforts by DFACS to obtain a criminal background check on her, but she eventually authorized the background check. Also, there was evidence that A.A., who had continued to abuse alcohol, would live with the maternal grandparents after she was released from jail. Further, as of the January 2004 trial, the maternal grandparents had only visited K.J., J.A., and J.J. on five occasions since the children had been placed in foster care. The juvenile court also noted that the maternal grandparents had never asserted a willingness to serve as a placement resource for all of the children; they had expressed some willingness to assume custody of J.A.
In regard to B.R. (A.A.'s brother) and his wife, C.R., we note that neither B.R. nor C.R. attended the first day of trial but that C.R. did attend the second day of trial after an intervening weekend at which she met with A.A., who had been released from jail. Dodson testified that C.R. contacted DHR in January 2003 about the possibility of serving as an alternative placement resource for K.J., J.A., and J.J. However, according to Dodson, when she contacted DFACS about C.R. in February 2003 she was informed that DFACS had performed a home study on B.R. and C.R.'s home in June 2002 and that the home had been denied approval. The report indicated that B.R. and C.R. were "having severe marital problems related to [B.R.'s] infidelity." DFACS also expressed concern that B.R. and C.R. would not keep A.A. away from the children. Dodson testified that a few months after the home study on B.R. and C.R., M.J. informed her that B.R. and C.R. "had separated and were no longer together"; unbeknownst to Dodson, however, B.R. and C.R. subsequently reconciled. Dodson *Page 269 
stated that, given the recent denial of approval by DFACS and the marital unrest in B.R. and C.R.'s home, she did not request an additional home study through the ICPC. See note 5, supra.
Dodson testified that after C.R. contacted her in January 2003 she never heard back from B.R. or C.R. regarding the status of C.R.'s request. Dodson also stated that she did not believe that B.R. and C.R. had ever visited the children. At trial, C.R. admitted that she had not seen J.A., K.J., and J.J. since Christmas 2002, approximately 13 months before trial. C.R. also admitted that she had not requested to visit the children, but she attempted to blame DHR for not contacting her.
Dodson testified that "in the interest of family preservation [she believed] that even up to the eleventh hour it's necessary to keep updating information and asking for new information to consider all options rather than removing children from their families." She also testified that DHR could withdraw its petition to terminate parental rights if a viable alternative relative placement was located. However, she stated that, in light of all of the information that she had received regarding the maternal grandparents and B.R. and C.R., including information that she had received after DHR filed its petition to terminate parental rights, termination of the parents' parental rights was the appropriate course of action.
B.R. and C.R. both were approximately 24 years old at the time of trial.[6] B.R. has a 10th-grade education; he quit high school because he could not get along with the principal. C.R. has a G.E.D. and she had attended technical school for two quarters. B.R. and C.R. have no children and they reside in a two-bedroom mobile home. Both B.R. and C.R. work. C.R. testified at trial; B.R. did not testify, though the parties stipulated that B.R. would testify that he and C.R. had a normal marital relationship and that they live in the same home.
C.R. testified that she believed that A.A. was a danger to K.J., J.A., and J.J. and that she would protect the children from A.A. However, C.R. admitted that during the weekend between the first and second days of trial A.A. and M.J. came to her home with the maternal grandmother and the two children that resided with the maternal grandmother. A.A. and M.J. stayed at B.R. and C.R.'s home with the children for several hours.
At the time of trial, K.J., J.A., and J.J. had been residing together with the foster parents for 18 months. The children were "adjusted, stable, and doing well." The foster mother testified that she and her husband had two children already and that they intended to adopt K.J., J.A., and J.J. if the juvenile court terminated the parents' parental rights. According to the foster mother, K.J. was "doing really, really good" in the first grade, J.A. was enrolled in a Head Start program, and J.J. remained at home. The foster mother believed that the children had adjusted well to her home and that they felt safe, loved, and protected. According to Davis, K.J.'s and J.A.'s counselor, who had observed all of the children in the foster parents' home, the three children had a strong bond among themselves and a bond with the foster parents' two children, "[a]nd that's a good thing." *Page 270 
Based on the foregoing, we cannot conclude that the juvenile court erred when it concluded that the termination of A.A.'s parental rights was in the best interests of K.J., J.A., and J.J.
 M.J.'s Appeal (case no. 2030644)
Like A.A., M.J. does not contend that he was able and willing to discharge his parental responsibilities, i.e., that the juvenile court erred by determining that he, as a parent, was "unable or unwilling to discharge [his] responsibilities to and for [K.J. and J.J.], . . . [and] that [his] conduct or condition is unlikely to change in the foreseeable future." Ala. Code 1975, § 26-18-7(a). As to M.J., the juvenile court specifically determined:
 1. That M.J. had a bond with his children, but he had "failed to consistently visit with his children, which has created disappointment and emotional stress for the children" and that he "has been and is currently unable to provide financially for his children";
 2. That M.J. was residing with the parents of A.A.;
 3. That "[b]y his own testimony, [M.J.] could have `done better over time,' in his words, if he had known that termination of parental rights was a possible outcome. This calls into question [M.J.'s] commitment to doing what he had to do to get his children out of foster care and maintain a relationship with them"; and
 4. That M.J. "has still not accepted that [A.A.] is in need of help and is a danger to her children. By [M.J.'s] testimony, it is evident that he will reunite with [A.A.], which is dangerous for his children due to [A.A.'s] propensity for becoming intoxicated and becoming violent."
In addition to the juvenile court's specific findings, which are supported by the evidence, the record would support findings that DHR made efforts to reunite M.J. with K.J. and J.J. but that M.J. was uncooperative. M.J. admitted that DHR informed him repeatedly that he would, in part, have to stay away from A.A. in order to obtain custody of K.J. and J.J. Based on M.J.'s testimony, he engaged in a pattern of allegedly ending his relationship with A.A., sometimes informing DHR that he wanted to obtain a restraining order against A.A., and then not following through; M.J. would inform DHR that he and A.A. "were going to work things out" and domestic violence inevitably ensued.[7] M.J. stated that he could not recall the number of times that he and A.A. had "broken off" and resumed their relationship because there were "so many incidents."
M.J. admitted that, despite A.A.'s alcohol-abuse problem, he purchased beer for her, including purchasing beer for her when she was pregnant with J.J. He admitted that he knew that purchasing alcohol for A.A. was "endangering the welfare of [J.J.]," but he stated that he "tried very hard not to give in to her." M.J. admitted that, as early as October 2002, he was aware that the children could not remain in foster care indefinitely and that he had to make progress or DHR would be required to file a petition to terminate his parental rights. The record reflects that in February 2003 M.J. was aware that DHR's goal was to return K.J. and J.J. to him if he could prove that he would protect *Page 271 
them from A.A.M.J. also admitted that, as recently as May 2003, he had agreed in an individualized service plan meeting that he must stay away from A.A. in order to obtain custody of K.J. and J.J. However, M.J. again resumed his relationship with A.A.
M.J. admitted that he had had "chance after chance after chance" to make choices that would enable him to obtain custody of K.J. and J.J., yet the record reflects that he failed to make the right choices. For example, DHR offered M.J. weekly counseling sessions with David Cunningham, a licensed professional counselor, at M.J.'s residence. However, according Cunningham, M.J. was not consistent in keeping his appointments, M.J. would not contact Cunningham to set up appointments as requested, and M.J. eventually refused his services in September 2003.
In regard to M.J.'s relationship with K.J. and J.J., J.J. had never been in M.J.'s custody and he had not bonded with M.J. Although K.J. initially had a strong attachment to M.J., M.J.'s repeated failures to appear for scheduled visitation had had a particularly negative impact on K.J. Between January 2003 and June 2003, before DHR filed its petition to terminate M.J.'s parental rights, M.J. failed to visit with the children on 62 of 72 visitation opportunities. Between June 2003 and December 2003, M.J. failed to visit with the children on 7 of 12 visitation opportunities. Two of M.J.'s more notable excuses for missing visitation were that he "lost track of time" when he was fishing in Georgia and that he "had to work or something like that." According to the children's foster mother, the children were initially excited about M.J.'s visits, but
 "at this point, we've had [the children] a good while, and the visits are scheduled on Wednesdays, and so now, [the children] don't make mention of it being a visit day, whereas, before [K.J.] especially would wake up that morning reminding us that it was the day of her visitation and she needed to wear something pretty and all this. Well, now, she doesn't even make any mention to us that it is visit day and she doesn't seem to show any disappointment."
Although M.J. argues that he missed scheduled visits, in part, because he had been injured at work in May 2003 and because he allegedly had transportation problems, M.J. admitted that he had only been bedridden for approximately one month after his alleged May 2003 injury. In regard to M.J.'s alleged transportation problem, Cunningham, who counseled with M.J. in Alabama before M.J. moved in with the maternal grandparents in November 2003, testified that M.J. apparently did not have a problem keeping his appointments with attorneys and doctors and that M.J. made "apparently frequent trips to see the [maternal grandparents, who resided in Georgia]." According to Cunningham, although M.J. claimed that his relationship with K.J. and J.J. was a priority for him, "the last two or three months that I met with him, it did not seem that the children were a priority; although, he said that it was, but his behavior did not indicate that." Cunningham also stated that he had a concern about M.J.'s ability to protect K.J. and J.J. from A.A. Further, Davis, K.J.'s counselor, recommended that M.J.'s parental rights be terminated, stating that the children "are needing some permanency and they need stability. They need to know where they're going to be, and that they're going to be safe."
Despite the foregoing incomplete, but more than adequate, recitation of the evidence that would support the juvenile court's conclusion that M.J. was unable or unwilling to fulfill his parental responsibilities and that M.J.'s condition or conduct *Page 272 
was unlikely to change in the foreseeable future, M.J., like A.A., contends that DHR failed to give proper consideration to B.R. and C.R. as an alternative placement resource for K.J. and J.J., presumably so he could rehabilitate himself and assume his parental responsibilities. We have already addressed the evidence that supports the juvenile court's conclusion that B.R. and C.R. were not a viable alternative placement resource. The juvenile court did not err when it terminated M.J.'s parental rights to K.J. and J.J.
 R.A.'s Appeal (case no. 2030644)
Unlike A.A. and M.J., R.A. contends that the evidence does not support a finding that he was "unable or unwilling to discharge [his] responsibilities to and for [J.A.], . . . [and] that [his] conduct or condition is unlikely to change in the foreseeable future." Ala. Code 1975, § 26-18-7(a). R.A. also contends that B.R. and C.R. were a viable alternative placement resource. In light of our previous discussion regarding B.R. and C.R., we need only discuss R.A.'s first contention.
R.A. immigrated to the United States from Tanzania approximately seven years before trial. In 1999, he married A.A. and J.A. was born. However, in 2001 R.A. and A.A. separated. According to R.A., he then became J.A.'s primary caregiver. R.A. testified that around Christmas 2001 he sent J.A. to A.A. for an extended stay. At the time, A.A. was residing with her paramour M.J. As noted above, in April 2002, DHR obtained custody of J.A. and K.J. Thereafter, R.A. did not regain custody of J.A.
As to R.A., the juvenile court determined:
 1. That R.A. "attended six out of eighty-nine possible opportunities to visit with [J.A.] over the past several months";
 2. That R.A. arranged a visit with J.A. as recently as December 2003, which R.A. failed to attend;
 3. That R.A. had a history of marijuana use and that he had used marijuana as recently as November 2003; and
 4. That R.A. "testified that [J.A.] has been his `first priority' over the past year, which calls into question [R.A.'s] commitment to his daughter if his lack of involvement in this case was evidence of [J.A.] being his `first priority'."
R.A. does not argue that the juvenile court's findings are substantially unsupported by the evidence; he admits that he abused marijuana at least until November 2003, that he visited J.A. on no more than 10 of 89 visitation opportunities in the 20 months before trial, and that he missed a visitation opportunity as recently as December 2003. Instead, R.A. contends that "despite [his] lack of involvement, he did take substantial steps to improve his life to the extent that he could regain custody of [J.A.]" R.A. also argues that he believed that A.A. and her parents would obtain custody of J.A. and that, until recently, he "had no idea that his failure to act would mean that his parental rights would be terminated."
R.A. testified that when J.A. was placed in foster care in April 2002, he was unemployed. R.A. stated that thereafter he began residing in his automobile and he began using marijuana. He testified that he did not realize that his parental rights might be terminated until DHR filed its petition to terminate his parental rights in July 2003.
According to R.A., at the time of trial he had been living at a new residence in Georgia for approximately six months and he had been employed as a manager of a Chevron gasoline station for approximately four months. Before his employment at Chevron, R.A. had been unemployed for *Page 273 
approximately four months. R.A. testified that on occasion he had lived in his automobile when he was unemployed or did not have a place to live.
R.A. testified that he had two more children with A.A., though he was not sure if they were legally his children. See note 1,supra. According to R.A., the two other children were in foster care "from what I understand." According to R.A., in October 2002, after he was asked by DHR to take a drug test, he admitted that he used marijuana. R.A. stated that approximately one and one-half months before trial he began attending drug-counseling classes and parenting classes at a private clinic. R.A. offered no explanation for the approximately two-year delay in his seeking assistance with his marijuana problem; he admitted that he did not seek help in October 2002, but he stated that it was "because I didn't know what I was supposed to do." R.A. also stated that the last time that he had used marijuana was in November 2003. He stated that his marijuana use had not been "that bad" in 2002 but that he had used marijuana on a "constant basis" beginning in early 2003. When asked at trial whether he would pass a drug screen, R.A. responded "[w]ell, not necessarily I would pass a drug screen, but I don't mind taking one, if you want." R.A. later stated that he might not pass a drug screen because marijuana might still be in his system from November 2003.
R.A. admitted that DHR tried to contact him and that they tried to assist him but that he had been "out of work or . . . moving." He admitted that after he tested positive for drug use "the first time, DHR told me I had to go to the drug program, and since then, I didn't follow it up . . . right away." Indeed, R.A. did not "follow it up" for two years. Also, R.A. admitted that he had been convicted of marijuana possession and that he was currently on probation.
Although R.A. testified that he had no transportation and that he had trouble arranging for visitation with J.A. because he lived approximately two hours away, Dodson testified that in August 2002 she specifically established R.A.'s standing-visitation appointment for each Wednesday, when R.A. was off work. Dodson affirmed that R.A. "agreed to this and said he would make those visits" but that he then failed to "follow through with appearing for those visits."
We note that R.A. scheduled the regular Wednesday visitation that he was allegedly unable to attend because of transportation problems. We also note that R.A. admitted that he was unemployed at several times after J.A. was placed in foster care, and yet there is no evidence that he made any attempt to find employment in Alabama, where he might be closer to J.A.
It is undisputed that DHR repeatedly attempted to assist R.A. in obtaining custody of J.A. but that R.A. was uncooperative. R.A. preferred marijuana and a life without J.A., apparently depending on a potential custody award to A.A. or the children's maternal grandparents. Although R.A. testified that he now had stable employment and a home for J.A., the juvenile court could have concluded that R.A. was not credible or that, given his history, R.A.'s allegedly improved circumstances were an anomaly.See J.D. v. Cherokee County Dep't of Human Res., 858 So.2d 274
(Ala.Civ.App. 2003). For example, despite R.A.'s alleged improvement since July 2003 when DHR filed its petition to terminate his parental rights, R.A. visited J.A. once and canceled two other visits. This single visit is consistent with R.A.'s past visitation practice.
As to R.A.'s relationship with J.A., Davis testified that, in her opinion, there was *Page 274 
 "[n]ot any attachment there that I've seen, and to take her away from siblings that she's bonded to, that she is comfortable with, that she has been with day in and day out for probably all of her life . . . would be so devastating that I wouldn't — You know, I just could not feel comfortable saying, yeah, I think that might be okay. Well I don't want to live with a might be okay. . . . It would be terrible. It would be terrible for that little girl."
Davis affirmed that she believed it was in J.A.'s best interest for R.A.'s parental rights to be terminated. Davis further stated that it would "just be too devastating to [J.A.] to even go down [the] road" of removing her from the foster home, attempting to place her in R.A.'s custody, and allowing her to visit with her siblings.
Based on the foregoing, we cannot conclude that the juvenile court erred when it determined that the first prong of Beasley
had been satisfied or that the juvenile court erred when it terminated R.A.'s parental rights.
The judgments of the juvenile court terminating the respective parental rights of A.A., M.J., and R.A. to K.J., J.A., and J.J. are hereby affirmed.
AFFIRMED.
CRAWLEY, P.J., and THOMPSON and PITTMAN, JJ., concur.
BRYAN, J., concurs specially, with writing.
[1] A.A. is also the mother of three other children whose custody was not at issue: C.R., a son who was born in August 1995, and Ro.A. and Ra.A., twin sons who were born in July 2000. C.R. has resided in Georgia with his maternal grandparents since he was born, which was when A.A. was approximately 17 years old. The record contains no information regarding the father of C.R. Ro.A. was placed in foster care in Georgia after A.A. tried to sell him for $10 to two strangers in February 2002. Thereafter, A.A. gave temporary custody of Ra.A., who has severe medical problems, to his maternal grandmother to prevent him from being placed in foster care. R.A., who was married to A.A. when Ro.A. and Ra.A. were born, is the presumptive legal father of Ro.A. and Ra.A, and he is listed as their father on their birth certificates. However, R.A. testified at trial that he was not sure if he was the biological father of Ro.A. and Ra.A.
[2] A.A. and M.J. apparently moved back and forth between Alabama and Georgia during their relationship.
[3] R.A. testified that when K.J. was fourteen months old (approximately June 1998) A.A. left K.J. alone in a motel room. K.J. wandered approximately one block from the motel room before she was picked up by the police. According to R.A., he was at work when A.A. left K.J. unattended.
[4] M.J.'s family resided in Nepal. R.A.'s family resided in Africa. No party has argued that the foreign relatives should have been considered as an alternative placement resource.
[5] Dodson stated that she had "a good working relationship" with Toni Williams, a DFACS caseworker, and that she had coordinated what was "going on" in Georgia with DHR's efforts in Alabama. According to Dodson, DFACS had the same goal as DHR, to find a suitable relative placement for the child or children at issue in their respective jurisdictions. Dodson testified that Georgia had been working on a placement for Ro.A. "[f]or the same amount of time that we have been involved in this case." Dodson stated that DFACS would have performed home studies for DHR if she had requested them, and Dodson admitted that DHR had not followed the procedures described in the Interstate Compact for the Placement of Children ("ICPC"), Ala. Code 1975, § 44-2-20 et seq. However, she stated that at the pertinent times at issue in this case DFACS had already performed or was in the process of performing home studies on the maternal grandparents and C.R. Dodson also stated that she did not request additional home studies, in part, because in her experience the ICPC process would take an additional "nine months minimum" and the circumstances of the cases at issue were "unique."
[6] Although some of the information concerning B.R. and C.R. and the maternal grandparents was introduced through hearsay reports prepared by DFACS and provided to DHR, no party objected to the juvenile court's consideration of the reports as evidence. We may not hold a trial court in error based upon a ground not presented to the trial court. See Andrews v. Merritt Oil Co.,612 So.2d 409 (Ala. 1992).
[7] For example, on one occasion A.A. "got a knife after [M.J.]" When M.J. was confronted about the incident, he stated, "I don't remember the date, but I believe it could of happened." M.J. later recalled that A.A. threw the knife at him, hitting him in the shoulder and resulting in his treatment at an emergency room. A.A. and M.J. later resumed their relationship.