J.W.M. appeals from a judgment of the Cleburne Juvenile Court entered on February 22, 2007, terminating his parental rights. We affirm.
 Background
J.W.M. ("the father") and K.P. ("the mother") are the biological parents of two children, T.M., born January 25, 2005, and J.J.M., born December 31, 2005. The Cleburne County Department of Human Resources ("DHR") took custody of the children within days of their births and have maintained custody ever since, with the children residing together in a foster home. On August 31, 2006, DHR filed a petition to terminate the father's and the mother's parental rights to the children. On December 15, 2006, the mother consented to the termination of her parental rights. Thereafter, the juvenile court conducted an ore tenus hearing on the petition to terminate the father's parental rights. On February 22, 2007, the juvenile court entered a judgment terminating the father's parental rights.
The father timely appealed to this court. In his brief on appeal, the father argues that the evidence was insufficient to terminate his parental rights.
 Standard of Review
In reviewing a judgment based on ore tenus proceedings, a trial court's findings of fact will not be disturbed "`unless those findings are plainly and palpably wrong and not supported by the evidence.'" H.E.B., Jr. v. J.A.D., 909 So.2d 840,842 (Ala.Civ.App. 2005) (quoting Williams v. hide,628 So.2d 531, 534 (Ala. 1993)). However, `"the ore tenus rule does not extend to cloak a trial judge's conclusions of law, or incorrect application of law to the facts.'" H.E.B.,Jr., 909 So.2d at 842 (quoting Eubanks v. Hale,752 So.2d 1113, 1144 (Ala. 1999) (opinion on return to second remand)). "`"The appellate courts do not sit in judgment of the facts, and [they] review the factfinder's determination of facts only to the extent of determining whether it is sufficiently supported by the evidence, that question being one of law."'" Ex parte T.V., 971 So.2d 1, 9 (Ala. 2007) (quoting Hinds v. Hinds, 887 So.2d 267, 272-73 n. 2 (Ala.Civ.App. 2003), quoting in turn Curtis White Constr.Co. v. Butts Billingsley Constr. Co.,473 So.2d 1040, 1041 (Ala. 1985)). In cases in which a parent challenges the sufficiency of the evidence to support a judgment terminating his or her parental *Page 434 
rights, this court is required to conduct a "careful search of the record," Moore v. State Dep't of Pensions Sec, 470 So.2d 1269, 1270 (Ala.Civ.App. 1985), to determine if clear and convincing evidence supports the judgment. Ala. Code 1975, § 26-18-7(a) (requiring clear and convincing evidence to support an order terminating parental rights); andColumbus v. State Dep't of Human Res., 523 So.2d 419,421 (Ala.Civ.App. 1987). See also L.M. v. D.D.F.,840 So.2d 171, 179 (Ala.Civ.App. 2002) ("Due to the serious nature of the action of terminating a parent's parental rights, this court must carefully review the unique set of facts established in each case in determining whether clear and convincing evidence was presented to support the termination of those rights."); and Santosky v. Kramer, 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) (holding that due process allows parental rights to be terminated only upon clear and convincing evidence of unfitness). "`"Clear and convincing evidence" is "[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'"Ex parte T.V., 971 So.2d at 9 (quoting L.M. v.D.D.F., 840 So.2d at 179, quoting in turn, Ala. Code 1975, § 6-11-20(b)).
 Applicable Law
Alabama Code 1975, § 26-18-7(a), a part of the 1984 Child Protection Act, § 26-18-1 et seq., Ala. Code 1975 ("the CPA"), sets forth the law regarding termination of parental rights. The CPA provides the grounds for termination of parental rights:
 "If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents."
§ 26-18-7(a). The CPA further provides a list of various factors a juvenile court must consider in determining whether a parent, who has not abandoned a child, is unable or unwilling to discharge his or her responsibilities to and for the child. Those factors include:
 "(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
 ". . . .
 "(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed."
§ 26-18-7(a)(2) (a)(6). In addition, in cases in which a child is not in the physical custody of the parent, the CPA also requires the juvenile court to consider, among other things:
 "(4) Lack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review."
§ 26-18-7(b)(4).
The juvenile court is not limited to consideration of the factors set out in § 26-18-7. See Ala. Code 1975, § 26-18-7(a) ("the court shall consider . . ., but not be limited to, the following. . . ."); see also *Page 435 
§ 26-18-7(b). Accordingly, a juvenile court may consider other factors bearing on the question of whether grounds for termination of parental rights exist. SeeBrown v. Alabama Dep't of Pensions Sec,473 So.2d 533 (Ala.Civ.App. 1985).
Our supreme court has declared that before a juvenile court may terminate a person's parental rights, it must conclude that there is no other viable alternative. Ex parte T.V.,supra. In many cases, DHR has a duty to use reasonable efforts to attempt to rehabilitate the parents so as to remove any obstacles to family reunification. See Ala. Code 1975, § 12-15-65(g)(2) and -65(m); and Miller v.Alabama Dep't of Pensions Sec, 374 So.2d 1370
(Ala.Civ.App. 1979). In addition, Ala. Code 1975, § 12-15-71(a), lists several alternatives to termination of parental rights, including:
 "(2) Place the child under protective supervision as herein provided or under the supervision of the Department of Human Resources."
See Hunley v. Houston County Dep't of Pensions Sec, 365 So.2d 81, 84 n. 1 (Ala.Civ.App. 1978); Millerv. Alabama Dep't of Pensions and Sec, supra. A juvenile court may terminate a person's parental rights only when clear and convincing evidence proves that the no other alternative is viable. T.V., supra.
 Evidence Presented at the Termination Hearing
DHR called as its first witness Dr. Dana Davis, a psychologist. Dr. Davis performed a psychological evaluation of both the father and the mother on February 25, 2005. Based on that evaluation, Dr. Davis concluded that the mother had a long history of schizophrenia, depression, anxiety, noncompliance with psychotropic medication regimens, and illegal drug abuse and dependency. Dr. Davis found that the father did not have any mental or emotional condition that would affect his ability to parent the children. Dr. Davis indicated that the father had helped raise the children of other women with whom he had had a relationship in the past and that he had experience in parenting. Dr. Davis described the father as "a stable guy emotionally and otherwise." Dr. Davis opined that the only potential parenting problems with the father that she identified were that he worked long hours and that he would have to depend on others, especially the mother, to act as the children's primary caregivers.
Dr. Davis did not consider the mother to be able to properly care for the children. Dr. Davis testified that she would be concerned if the father remained in a relationship with the mother while the mother was still using illegal drugs. Dr. Davis testified that the father could not effectively parent the children so long as he continued his relationship with the mother because of the mother's inability to change. Dr. Davis stated that the father's recent break-up with the mother would not be enough to convince her that the father had ended his relationship with the mother because of the parties' past behavior. Dr. Davis also expressed that she would be concerned if the father had failed to work with DHR to develop a plan for him to slowly reunify with the children with him acting as the sole caregiver.
Dr. Davis was aware that the father had a prior history of alcohol abuse and illegal drug use, but she stated that she had been informed that the father was not actively using either substance. She stated that she would be concerned if the father had, in fact, used illegal drugs in the two years preceding the termination hearing. After discovering that the father had last tested positive for methamphetamine and marijuana in 2005, Dr. Davis testified that it *Page 436 
appeared to her that the father had shown promise in discontinuing his use of drugs and that counseling sessions could assist him in handling his parental responsibilities. However, she later testified that she would be concerned if the father's counseling sessions had stopped in the six months before the termination hearing because of his admission of drug use.
DHR next called Carrie Halladay, a licensed professional counselor, who had counseled the father and the mother and oversaw their drug testing. Halladay testified that in May 2005 she started counseling the father and the mother concerning their illegal drug use and the mother's mental-health issues. Both parents had tested positive for methamphetamine. The father last tested positive for drug use in December 2005. Halladay terminated the counseling sessions in July 2006, when the mother and the father still lived together, because they continued to miss appointments and the mother continued to test positive for drugs. Halladay resumed counseling the father in September 2006, at which time the father informed her that he had split from the mother. However, when Halladay called the father at the telephone number he had provided, the mother answered the telephone. The mother informed Halladay that she was just there to pick up her things, but Halladay did not believe her.
In the resumed counseling sessions, Halladay mainly addressed the steps the father needed to take to assure that he stayed off drugs, but she also counseled the father on parenting skills. Halladay testified that she did not consider the father to be a serious drug user at the time of the termination hearing, but she admitted that he had a tendency to relapse. She based this latter opinion on the father's prior positive drug tests at a point when the father had disclaimed any drug use.
Halladay testified that she had also counseled the father on basic parenting principles, such as how to discipline the children, how to determine schedules, how to get the children up and ready for the day, and how to feed the children. Halladay testified that the father "certainly" had basic parenting skills and had developed a safe and viable plan to care for the children. The father informed Halladay that he worked long hours but that his boss was very lenient and would allow the father time to drop the children off at day care in the morning and to leave work at 4:30 p.m. to pick them up.
Halladay testified that she was concerned by the father's relationship with the mother. Halladay characterized the father as a codependent who could be easily manipulated by the mother, who Halladay considered to be an active drug addict. Halladay testified that she had not observed any progress on the part of the father in counseling to indicate that he was becoming less of a codependent until after DHR had filed its petition to terminate the father's parental rights. Halladay stated that she would still be concerned about the father's dependence on the mother even if the father had separated from the mother in the last few weeks before the termination hearing. Halladay stated that if the father had split from the mother only recently, that fact would affect her opinion of his credibility and of his ability to properly parent the children. Halladay opined that the father could properly care for the children so long as he was not in a relationship with the mother; however, she did not believe enough time had passed to indicate that their relationship had truly ended. Halladay did not believe that the father would be able to maintain the separation *Page 437 
despite her counseling efforts in that regard.
Nicole Brown, the DHR social worker assigned to the children's cases since August 2005, testified that DHR had taken custody of T.M. because of the mother's altered mental state and the mother's statement that she did not want the children. DHR obtained DNA testing that proved the father's paternity at that time. DHR had taken custody of J.J.M. 10 days after his birth. Since that time, DHR had been dealing with the mother's mental-health problems and drug abuse, as well as the father's drug use. Brown had last been in the father's home six months before the termination hearing, when the parents were still living together. At that time, the mother was still using drugs and DHR determined that the parents could not properly care for the children, so it filed the petition to terminate their parental rights. Brown testified that nothing had changed since the filing of the petition to convince her that termination of the father's and the mother's parental rights was not necessary.
Brown testified that she had observed the children interacting with the mother and the father during visitations. She stated that T.M. appeared to have a very good relationship with the father but that J.J.M. appeared more attached to the mother. Brown testified that the children were more closely bonded with their foster parents, who were prepared to adopt the children.
According to Brown, DHR attempted to reunify the children with the father and the mother through counseling; however, she testified that, except for the father's negative drug-test results, no substantial progress had been made. Brown opined that she did not believe that the father would make any further progress with additional counseling. By at least January 23, 2006, Brown informed the father that his best hope to regain custody of the children was to sever all ties with the mother. Brown stated that DHR had also considered relative placements but had found no suitable relative willing or able to care for the children.
Brown testified that, although he had indicated that he had separated from the mother, the father still attended all visitations with the mother, they arrived and left visitations together in the same automobile, and they interacted with one another the same as they always had since DHR had become involved with them. Brown testified that she believed that the father and the mother were still together, although she admitted that they could have just been riding together. Brown also believed that, even though the mother had consented to a termination of her parental rights, the father would reunite with the mother if he obtained custody of the children. Brown testified that, if not for his relationship with the mother, which he had only recently tried to end, the father would have the ability to care for the children. Accordingly, she maintained that the father had not adequately adjusted his circumstances to meet the needs of the children and that termination of the father's parental rights was in the best interests of the children.
The father, a 50-year-old logger, testified that he works from early in the morning until nighttime, depending on the weather and other circumstances. On Tuesdays and Fridays, he testified, he works until his boss takes him to his regularly scheduled visitations with the children. He stated that his boss drives him because he does not have a working automobile and has not held a valid driver's license for many years. The father testified that he had discussed the matter with his boss, for whom he had worked the last *Page 438 
20 years, and that they had agreed that the father could rearrange his work schedule so he could get the children from day care at 4:30 in the afternoon in the event the father received custody. The father also planned to purchase a new automobile within the next two weeks after the termination hearing and to obtain his driver's license.
The father testified that he had tested positive for drugs after DHR had taken custody of the children because he was fighting depression. The father stated that he felt like DHR had set unreasonable and inconsistent conditions that he could not meet and that he was fighting a losing battle to obtain custody of the children. He also acknowledged that the mother's behavior was the main reason he could not reunify with the children and that he would have to leave her. The father denied using any alcohol since 1997, and he denied using any drugs since December 2005, although he admitted that, before then, he had used drugs since the 1970s.
The father testified that DHR had told him in July or August 2006 that he would have to separate from the mother. The father testified that he had split from the mother around the first part of September 2006, after DHR had filed the petition to terminate his parental rights, and that he no longer attended visitations with her. The father stated that the mother had answered the telephone when Halladay called in September 2006 because she was there to move her things out, which took several trips. The father testified that he and the mother had mutually agreed to break up in order for the father to obtain custody of the children. Nevertheless, he admitted that he still loves the mother; he just loves the children more. The father testified that he had stayed with the mother for so long because he had wanted to preserve the children's relationship with the mother, if at all possible. The father stated that he had concluded that that was not possible after DHR filed the petition to terminate their parental rights. The father also stated that if his parental rights were not terminated, he would still feel that it was important for the children to know their mother. However, he testified that if the court told him he could not have any contact with the mother, he would abide by that order.
 Analysis Grounds for Termination of Parental Rights
The father initially asserts that the record does not contain clear and convincing evidence supporting the termination of his parental rights. Specifically, the father maintains that he had quit using drugs and had ended his relationship with the mother so that he was able and willing to care for the children and that he did not suffer any condition or engage in any conduct that rendered him unable to properly care for the children.
In J.D. v. Cherokee County Department of HumanResources, 858 So.2d 274 (Ala.Civ.App. 2003), this court addressed the same issue as the one presented in this case, namely
 "whether the parent's recent progress was substantial and consistent and, therefore, indicative of a willingness and ability to maintain that progress, or whether the parent's efforts were late, incomplete and, therefore, unconvincing, measures taken only in anticipation of the termination-of-parental-rights hearing."
J.D., 858 So.2d at 277. If the juvenile court is convinced from its observations that the parent acted shortly before the termination-of-parental-rights hearing so as to make it appear that he or she was *Page 439 
addressing or had resolved identified obstacles to reunification but that, in reality, the barriers to reunification had only been temporarily removed or merely hidden, the juvenile court may conclude that grounds for termination still exist. See, e.g., J.S. v. St. Clair Deftof Human Res., 969 So.2d 918 (Ala.Civ.App. 2007); D.M.v. Walker County Dep't of Human Res., 919 So.2d 1197
(Ala.Civ.App. 2005); and A.A. v. Cleburne County Dep't ofHuman Res., 912 So.2d 261, 273 (Ala.Civ.App. 2005) ("the juvenile court could have concluded that [the parent] was not credible or that, given his history, [the parent's] allegedly improved circumstances were an anomaly").
In this case, clear and convincing evidence established that the father had a tendency to relapse into drug use and that it was extremely unlikely that he had permanently terminated his relationship with the mother, if that relationship had ended at all. With regard to his drug use, the father admitted that he had lied in the past when he had stated that he was not using drugs, thereby permitting the inference that he was still using drugs at the time of the termination hearing even though he had not tested positive for drugs since December 2005. With regard to the father's relationship with the mother, the evidence was overwhelming that the father was a codependent who was easily manipulated by the mother; that he had been counseled for this problem and had not made any progress toward resolving his codependency; and that he continued to express a desire to keep the mother in the children's lives. Thus, the juvenile court could have been convinced that the father had not resolved the issues that prevented him from assuming the care and custody of the children.
Moreover, the CPA declares that parental rights may be terminated if the parent has a condition that renders him or her unable to properly care for the children and that condition is unlikely to change in the foreseeable future. By his own testimony, the father stated that even if he maintained his separation from the mother, whose parental rights have been irrevocably terminated at this point, he would still allow the children to visit with the mother. In other termination-of-parental-rights cases, we have held that a child could not be placed with a relative if that relative still associated with the parent whose rights had been terminated because such custody would expose the child to the unfit parent in violation of the purpose of the CPA. See, e.g., D.H v.Calhoun County Dep't of Human Res., 837 So.2d 313, 315
(Ala.Civ.App. 2002); and S.T. v. State Dep't of HumanRes., 579 So.2d 640, 643 (Ala.Civ.App. 1991) (citingMoore v. State Dep't of Pensions Sec,470 So.2d 1269). We find those cases analogous to this case, and we apply their reasoning in concluding that the father's codependency constitutes an unresolved condition that prevents the father from properly caring for the children and that that condition is unlikely to change in the foreseeable future.
Accordingly, the juvenile court did not err in finding that grounds existed to terminate the father's parental rights.
 Viable Alternatives
The father next argues that if the juvenile court was not convinced that the father had been fully rehabilitated, the juvenile court should have maintained the status quo while the father completed his rehabilitation efforts. In Ex parteT.V., 971 So.2d 1, the supreme court held that the juvenile court should have maintained the status quo, leaving custody of the child in a third party, while the mother, who had been completely rehabilitated, developed a bond with the child. However, this case differs significantly fromT.V. in that the *Page 440 
father has not been completely rehabilitated and lack of bonding is not a factor the juvenile court relied upon in deciding to terminate the father's parental rights.
DHR and juvenile courts are required by statute to give a parent a reasonable time to be rehabilitated. "At some point, however, the child's need for permanency and stability must overcome the parent's good-faith but unsuccessful attempts to become a suitable parent." M.W. v. Houston County Dep't ofHuman Res., 773 So.2d 484, 487 (Ala.Civ.App. 2000). In this case, DHR notified the father in at least January 2006 that he needed to separate from the mother in order to gain custody of the children. Before January 2006, DHR had been working with both parents to end their drug use and to resolve the mother's mental-health issues. By that point, it evidently appeared to DHR that the mother was not likely to be successfully rehabilitated. Nevertheless, according to his own testimony, the father did not separate from the mother until September 2006. The father claims that he waited so long to leave the mother because he wanted to save her relationship with the children, but the evidence was undisputed that Halladay had terminated the parties' counseling due, in part, to the father's failure to regularly attend the counseling sessions. The evidence also indicates that the father had made no substantial progress regarding his codependency. The juvenile court could have reasonably concluded that the father was not making a good-faith attempt to become a suitable parent; that, if he was, his attempt was not likely to be successful; and/or that the reasonable time for rehabilitation had ended. Clear and convincing evidence supports any of those determinations.
For the foregoing reasons, we find that clear and convincing evidence supports the juvenile court's implicit finding that there was no viable alternative to termination of the father's parental rights.
AFFIRMED.
PITTMAN, J., concurs.
THOMPSON, P.J., and BRYAN and THOMAS, JJ., concur in the result, without writing.