THOMPSON, Judge.
On January 3, 2002, the Houston County Department of Human Resources (hereinafter “DHR”) filed a petition seeking to terminate the parental rights of S.W. (“the mother”) and S.T., the alleged father, to M.T. and K.T. (“the children”). On April 2, 2002, the trial court held a hearing and received ore tenus evidence. On April 4, 2002, the trial court entered an order terminating the mother’s parental rights.[1] The mother appealed.
At the time of the hearing, the mother was 20 years old, M.T. was 23 months old, and K.T. was 8 months old. DHR had assumed custody of each of the children on the days after their births. The record indicates that DHR had been involved with the mother since 1991 and that the mother had been in DHR’s custody from 1991 to 1998. The record indicates that the mother had had behavioral problems as a teenager and that DHR attempted on 24 occasions to place the mother in a foster home, but that all of those placements were unsuccessful.
The mother and S.T. never married. The mother’s relationship with S.T. involved a great deal of physical violence. The record contains hospital reports prepared by doctors and nurses following the mother’s hospital visits, as well as court reports prepared by DHR social workers throughout DHR’s involvement with the family. Although the mother indicated to both DHR and hospital employees that S.T. had physically abused her in the past, the first documentation regarding that violence occurred on February 9, 2000, when the mother was hospitalized after she was assaulted by S.T. The hospital record from that date indicates that the mother reported that S.T. had kicked her repeatedly in the face, head, and abdomen and had sexually assaulted her. At the time of the February 9, 2000, assault, the mother was more than six months pregnant with M.T.
The mother was readmitted to the hospital on February 18, 2000, and she was diagnosed with vaginal bleeding. S.T. visited the mother at the hospital on February 20, 2000; following S.T.’s visit, the mother suffered a nosebleed. The mother initially denied that she was assaulted by S.T. during the visit, but eventually admitted that during his February 20, 2000, visit, S.T. struck her in the nose.
The mother testified that on March 26, 2000, S.T. assaulted her and stuck a telephone antenna up one of her nostrils. When questioned by the court regarding that particular incident, the mother stated that the assault occurred when S.T. became angry with her while she was talking on the telephone. On April 3, 2000, the mother delivered M.T. by cesarean section. The record indicates that S.T. also assaulted the mother on April 6, 2000, three days after M.T.’s birth. The record indicates that the mother contacted DHR following the April 6, 2000, attack and that DHR placed the mother in a “protection-from-abuse” shelter that night. The record indicates that the mother left the shelter the following day. According to the record, the mother resumed her relationship with S.T., and the domestic violence continued.
*1148 DHR provided counseling services for the mother, but the mother stopped attending her counseling sessions in May 2001; the record indicates that when the mother stopped attending her counseling sessions, the counselor began attending some of the mother’s meetings with DHR. The record contains the notes from the mother’s counseling sessions and the DHR meetings. Those notes indicate that the mother consistently recognized that her relationship with S.T. jeopardized her relationship with her children, but that she continued to maintain a relationship with him. The record also contains the counsel- or’s September 20, 2001, notes from the last DHR meeting he attended with the mother. The notes indicate that the mother continued to maintain contact with S.T.
Sarah Shinz, a social worker for DHR, testified that she worked on the case involving the mother and the children. Shinz testified that S.T. had physically abused the mother throughout the time DHR had been involved with the family. According to Shinz, the mother had also been violent toward S.T., and the mother had informed her that she had stabbed S.T. on two occasions. Shinz testified that numerous warrants had been issued for both S.T. and the mother for the physical harm each had inflicted on the other.
M.T. was born on April 3, 2000, and taken into custody by DHR on April 4, 2000. Shinz testified that DHR developed several safety plans, the goal of which was to reunite the mother with M.T., but that the mother failed to comply with those plans. Shinz testified that DHR had difficulty formulating a safety plan for the mother because the mother refused to acknowledge that a safety risk existed. Shinz stated that the first safety plan required the mother to sever her relationship with S.T., not to allow S.T. access to her home, and to contact the police if S.T. came to her home and tried to harm her in any way. According to Shinz, DHR employees consistently stressed to the mother that S.T. could not be in the mother’s home when the children were present for visitation. The record indicates that S.T. was discovered in the mother’s house during her first in-home visit with M.T.[2]
K.T. was born on July 5, 2001. Shinz testified that S.T. was incarcerated the day K.T. was born, and that DHR had “great hopes” that the mother would be able to parent K.T. safely because of S.T.’s incarceration. The record indicates that although the trial court awarded DHR legal custody of K.T. the day after her birth, the court allowed the mother to have physical custody of K.T. The record indicates that the mother agreed to notify DHR when she learned of S.T.’s release from prison. Shinz testified that she observed S.T. near the mother’s home on August 20, 2001, and that she learned that on August 18, 2001, S.T. had been released on bond. The mother admitted that she was aware that S.T. was out of prison and that she had allowed him to stay in the home with her and K.T. DHR assumed physical custody of K.T. and placed K.T. in foster care.
Shinz testified that the mother had never tested positive for drugs. Shinz testified that the mother’s home was generally neat and clean and that when the mother had physical custody of K.T., she had an adequate supply of diapers and formula in her home. Shinz stated that the mother had completed parenting classes provided through DHR. Shinz testified that DHR provided individual counseling for the *1149 mother, but that the mother refused to attend the individual counseling sessions after May 2001. According to Shinz, the mother readily accepted tangible services offered by DHR and she received extensive services from the Family Service Center. Shinz testified that the mother received job training from Project Hope and from Family Builders and that the mother worked for a brief period at the local food bank. Shinz stated that even with the services and programs DHR offered to her, the mother was unable to maintain steady employment. The record indicates that DHR also provided the mother transportation to school, to day care,[3] to Individualized Service Plan meetings, and to job interviews; that it assisted the mother in obtaining Medicaid; and that it made numerous referrals for the mother to the House of Ruth.[4] The record indicates that the mother entered the House of Ruth on two occasions, but that on both occasions she stayed for only a brief period. The record indicates that the mother was also placed in Heritage House.[5]
Shinz testified that the mother had informed her that since KT.’s birth in July 2001, she had been pregnant by S.T. on three other occasions.[6] Shinz testified that at the time of the April 2, 2002, hearing the mother had several charges pending against her, but had not yet gone to court on those charges; the record does not indicates the nature of those charges. Shinz stated that the mother had never paid child support for the children.
Shinz testified that the mother continued to maintain a relationship with S.T. throughout DHR’s involvement in the case. Shinz testified that in her opinion, the mother was not capable of properly caring for the children. Shinz testified that the mother had poor judgment; that she refused to make the changes necessary to enable her to care for her children, including ending her relationship with S.T.; that she refused to attend counseling; that she could not maintain employment; and that she had not been completely candid with DHR.
Shinz testified that there were no relative placement resources for the mother. Shinz testified that A.A., S.T.’s mother, and M.B., S.T.’s aunt, came to DHR in March 2002, and that M.B. expressed an interest in being a relative placement for the children. Shinz stated that M.B. provided DHR with her telephone number and the name of her employer. According to Shinz, she attempted to call the telephone number, but the number had been disconnected. Shinz testified that she telephoned M.B.’s employer and left a message for M.B. to contact her. Shinz testified that she also contacted A.A. and asked A.A. to have M.B. contact her. Shinz stated that she was unable to contact M.B. and that M.B. did not return her telephone calls. Shinz testified that during a conversation with A.A., A.A. informed her that if M.B. was given custody of the children, M.B. would allow S.T. to have contact with them. Shinz testified that at the time of the hearing, no person had filed a petition *1150 seeking to be a relative-placement resource for the children.
The mother testified that she did not have a problem and that she was a good parent. The mother testified that, at the time of the hearing, she was unemployed, but that she was actively seeking employment. According to the mother, her only source of income was from hairstyling, but she did not have a cosmetology license. The mother’s employment history is sporadic. The mother stated that she was studying at home to take her GED exam. The mother testified that she did not consume alcoholic beverages or take illegal drugs. The mother admitted that she had not continued counseling, stating that she did not feel like talking during her counseling sessions. The mother testified that if DHR currently requested her to do so, she would resume counseling sessions.
The mother admitted that S.T. had assaulted her, but the mother testified that S.T. had not physically assaulted her since May or June 2001, just before KT.’s birth. The mother testified that she had not spoken with S.T. in the five months preceding the hearing in this matter and that she and S.T. were no longer involved in a relationship. According to the mother, at the time of the hearing S.T. was in a relationship with someone else. The mother also testified that she had last seen S.T. the previous Thursday during a visit with the children. The mother testified that she was six months pregnant at the time of the hearing and that S.T. was the father of the child. The mother testified that S.T. had never done anything to indicate to her that he would harm the children.
On appeal, the mother asserts that the trial court erred in terminating her parental rights. Following an ore ten-us proceeding, the trial court’s determination of the factual issues is presumed correct and will not be disturbed on appeal absent a showing of palpable error. F.L.L. v. State Dep’t of Human Res., 612 So.2d 501 (Ala.Civ.App.1992). This court has consistently held:
“Every parent has a prima facie right to custody of his or her child and that right can only be overcome by a showing of clear and convincing evidence that removing the child from the parent’s custody would be in the best interests of the child. M.H.S. v. State Dep’t of Human Resources, 636 So.2d 419 (Ala.Civ.App.1994).
“ ‘The trial court is given the authority to terminate parental rights if it finds from clear and convincing evidence that the parents are unable or unwilling to discharge their responsibilities to and for the children. § 26-18-7, Ala.Code 1975. The trial court shall consider whether the parents have abandoned their children, whether the parents have problems with drugs or alcohol, and whether reasonable efforts to rehabilitate the parents have failed. § 26-18-7(a), Ala.Code 1975. If the children are not in the physical custody of their parent or parents, the trial court shall also consider such circumstances as whether the parents have provided material needs for the children, whether the parents have maintained regular, scheduled visits with the children, and whether the parents have adjusted their circumstances to meet the needs of the children according to agreements reached administratively or judicially. § 26 — 18—7(b), Ala.Code 1975.’
“M.H.S. v. State Dep’t of Human Resources, 636 So.2d at 421.
“Where a nonparent petitions to terminate a parent’s parental rights, the trial court must apply a two-pronged test. Ex parte Beasley, 564 So.2d 950, 952 (Ala.1990). The trial court must *1151 first determine that the child is dependent. Id. After finding the child dependent, the court must examine viable alternatives to the termination of parental rights. Id. On appeal, the trial court’s determination is presumed to be correct, and it will not be reversed absent a showing that the decision is so unsupported by the evidence as to be plainly and palpably wrong. M.H.S. v. State Dep’t of Human Resources, supra. In a proceeding to terminate parental rights, the paramount consideration of the trial court, and of this court, is the best interests of the children involved. Id.”
A.R.E. v. E.S.W., 702 So.2d 138, 139-40 (Ala.Civ.App.1997).
With the exception of the month during which the mother had custody of K.T., both K.T. and M.T. have been in DHR’s custody or in foster care since the day after their births. The record indicates that DHR consistently warned the mother that her relationship with S.T. placed her relationship with her children at risk. Further, although the mother continually acknowledged this risk, she refused to terminate her relationship with S.T. The mother testified that at the time of the hearing in this matter she was again pregnant with S.T.’s child. The mother has received extensive job training, but fails to maintain consistent employment. The mother also refused to continue her counseling sessions. The record indicates that the mother was consistently unwilling or unable to comply with the agreements she entered into with DHR and to make the changes necessary to enable her to care and provide for her children. In addition, the record indicates that DHR was unable to find a suitable relative-resource placement for the children. The trial court found that the mother was unwilling and unable to provide for the children’s needs and that there were no viable alternatives to the termination of the mother’s parental rights. Given the evidence in the record on appeal this court cannot say that the trial court’s termination of the mother’s parental rights was plainly or palpably wrong. SeeA.R.E. v. E.S.W., supra,
AFFIRMED.
YATES, P.J., and PITTMAN, J., concur.

. The record indicates that, at the time of the hearing in this matter, the paternity of the children had not been established. The trial court’s order states that it terminates the parental rights of the "natural parents and all other interested parties.” Only the mother appealed. Thus, for purposes of this opinion, this court will address the facts only as they relate to the mother and the children.

. The record indicates that S.T. was hiding in a back room of the house; that the mother informed the DHR case worker that S.T. was in the house; and that the DHR case worker "called” him out of hiding.

. The record indicates that during the month that the mother had physical custody of K.T., DHR provided transportation to enable the mother to take K.T. to day care, to attend school, and to retrieve K.T. from day care after completing her classes.

. The record indicates that the House of Ruth is a protection-from-abuse shelter.

. The record indicates that Heritage House is a protection-from-abuse shelter.

. The mother did not state and the record does not indicate the result of those pregnancies.