984 So.2d 1196 (2007)
A.S.
v.
W.T.J.
2060506.
Court of Civil Appeals of Alabama.
November 30, 2007.
*1197 Larry E. Darby, Montgomery, for appellant.
Thomas H. Claunch III of Harding & Claunch, LLC, Montgomery, for appellee.
PER CURIAM.
A.S. ("the mother") appeals a judgment denying her petition to terminate the parental rights of W.T.J. ("the father") regarding the parties' minor children, K.N.J. and E.D.J. (collectively referred to hereinafter as "the children").
The mother and the father were married for two and one-half years. The parties had two children together, K.N.J. ("the daughter") *1198 and E.D.J. ("the son"), ages eight and nine, respectively, at the time of the trial.
The mother testified that the father had committed acts of domestic violence against her on several occasions during the marriage. She stated that the first incident of domestic violence had occurred in 2001. According to the mother, the father had held a samurai sword to her throat, threatening to cut her. The mother stated that the children had been present in the home at the time that incident had occurred. She testified that she believed that the son had been asleep but that the daughter had awakened after the father was taken into police custody. However, the mother later testified that the daughter had witnessed the incident and that the son had heard it but did not witness it. Furthermore, the daughter testified that she had observed the father holding the sword to the mother's throat, threatening to kill her. The son also testified that he had witnessed that incident.
The father denied that he had threatened to kill the mother with a sword. According to the father, he and the mother had had an argument; he then placed the sword near a desk where the mother had been sitting. The father testified that the children had not been at the home but had been visiting with their maternal grandmother.
The evidence established that the father had been convicted of domestic violence for acts he committed during the incident involving the sword. A court found the father guilty, and the father was sentenced to 48 hours imprisonment and supervised probation.
The mother testified regarding another incident of domestic violence. According to the mother, the father had been consuming alcohol when he and the mother began to argue. Then, the father struck the mother in the back of her head, knocking her to the floor. Hearing the argument, the son came into the mother and the father's bedroom, stood between the mother and the father, handed the mother a bat, and told the mother to strike the father with the bat. The son testified that he had placed himself in front of the mother to prevent the father from hitting her. The mother testified that the father had a warrant issued for her arrest for domestic violence as a result of that incident and that she filed a cross-warrant against the father for acts that occurred during that incident. The charges against the mother were subsequently dismissed.
The mother also testified that the father had threatened her with a knife. The children also testified that they had observed the father threatening the mother with a knife. Additionally, the daughter testified that the father had threatened to strike her, the son, and the mother with a pole. The son testified that the father had acted violently toward the daughter and the mother. However, the son testified that the father has never threatened him. The father denied that he had ever harmed or threatened to harm the children.
The mother testified that there had been several other incidents in which the father had committed acts of domestic violence against her. She testified that the father would consume alcohol in excess and would then become violent. The mother testified that the father had told her that, during the times when the father would become violent, he would "black out" and his alter ego named Jonathan would emerge. According to the mother, the father had told her that "Jonathan" would take control, that "Jonathan" would become violent, that the father had no memory of the acts committed by his alter ego, and that he was not responsible for those acts. The *1199 father denied that he has an alter ego named Jonathan.
Because the father had pleaded not guilty by reason of mental disease or defect for acts he had allegedly committed during the incident involving the sword,[1] a court ordered the father to submit to a psychological evaluation. Dr. Karl Kirkland evaluated the father and authored a report stating his findings and conclusions. Although that report was not admitted into evidence, the father read into evidence certain portions of that report. The portions of that report that were read into evidence indicate that the father mutilates himself by cutting his arms and chest. Additionally, portions of the report the father read into the record indicate that the father's alter ego, "Jonathan," emerges when he is stressed. The father admitted that he had told Dr. Kirkland that he has frequent thoughts of injuring people, including the mother. The father also admitted that Dr. Kirkland's report indicated that the father has a tendency to abuse alcohol. The father testified that he has been diagnosed with borderline personality disorder, nicotine dependence, and an extreme anger-management disorder.
The father admitted that he had a problem with anger management, but he believes that he no longer has that problem. He testified that he has addressed that problem by attending counseling for a "couple of months."
The evidence established that the mother and the father divorced in December 2002. Incorporating the terms of the parties' settlement agreement, the Montgomery Circuit Court ("the circuit court") awarded the parties joint legal custody of the children, with the mother having primary physical custody subject to the visitation rights of the father. However, the circuit court suspended the father's custodial and visitation rights until he completed the Families in Transition program ("FIT program"). Additionally, the circuit court ordered the father to pay child support in the amount of $200 per month and to pay the costs of the children's health insurance.
The father did not complete the FIT program until May 2006, almost three and one-half years after the entry of the divorce judgment. The father testified that he did not complete the FIT program earlier because either he had been incarcerated or he had lacked transportation. Nevertheless, the father admitted that he did not petition to enforce his visitation rights after he had completed the FIT program. He testified that he had failed to do so because he desired to resolve disputes with the mother regarding the children without initiating legal proceedings. However, the father stated that he had consulted with an attorney to discuss a course of action to enforce his visitation rights. Nevertheless, the evidence established that the father had not visited with the children after the parties' divorce.
The mother testified regarding two occasions when the father had visited with the children before the parties had divorced. The mother testified that her attorney had advised her that she was under no obligation to permit the father to contact the children until the father completed the FIT program.
The mother testified that the father had telephoned her twice requesting to speak with the children. When the father asked to speak with the children on the first occasion, the children refused. When the *1200 father telephoned the mother on the second occasion, the children spoke with the father, but they told him to leave them alone and that they did not "want to have anything to do with [him]." The mother then told the father to stop calling because it was upsetting the children.
The mother testified that, sometime after the divorce, she had obtained a restraining order against the father to prevent him from contacting her and the children because, she said, he had threatened to harm her if she prevented him from visiting with the children.
The father testified that the mother had deliberately and repeatedly denied him contact with the children. The father stated that, during the four years preceding the trial, he estimated that he had made more than 200 attempts to contact the children. The father stated that, during the year preceding the trial, he had not attempted to contact the mother as frequently as he previously had. He also stated that he telephoned the mother by calling her cellular telephone but that the mother had turned the cellular telephone off or had changed the number. However, the mother testified that the father has known her address since they divorced.
The mother testified that, after the divorce, she had encouraged the children to spend time with the father. However, the son testified that the mother does not encourage him to have a relationship with the father. J.N., the mother's husband, testified that he has not known the mother to encourage the children to have a relationship with the father; rather, he said, he and the mother allow the children to decide whether they desire to have a relationship with the father.
The mother testified that she had made positive statements about the father to the children; however, she was unable to recall the nature of such statements. Nevertheless, the mother admitted that she also had made negative statements about the father to the children.
The daughter testified that she is afraid of the father and that she believes that the father would harm her. The daughter further stated that she does not want to have visitation with the father. The son testified that he is not willing to attempt to forgive the father for his acts committed against them. The children testified that they consider J.N. to be their father. J.N. testified that he has a bond with the children and wishes to adopt them.
Both children testified that they desired that the court terminate the father's parental rights. The mother and J.N. denied that they had instructed the children regarding the content of their testimony. However, J.N. admitted that the children may have overheard conversations regarding the termination of the father's parental rights.
The father testified that he loves the children. The father admitted that he had not been a good father for the children during the five years preceding the trial. However, he stated that he is a different person than he was five years ago. The father stated that he is aware that the children desire not to have a relationship with him; however, he stated that he is willing to take steps necessary to reestablish a relationship with the children.
The evidence established that the mother had sought judgments to find the father in contempt for his failure to pay, among other things, his child-support obligation. The circuit court entered judgments finding, among other things, the father in contempt for his failure to pay his child-support *1201 obligation in April 2003, July 2003,[2] October 2003,[3] November 2003, and March 2004. The evidence established that the father had paid a total of $299.69 in child support and that a child-support arrearage of between $14,000 and $15,000 had accrued. The evidence also established that the father had failed to pay the costs of the children's health insurance.
The father testified that he had failed to pay child support because he had been incarcerated at various times and, at other times, he had been unemployed.[4] However, the father testified that the mother had intentionally filed contempt petitions during the times when the father had been incarcerated. A report the father submitted to the juvenile court indicates that the father was incarcerated from May 2003 to August 2003; from November 2003 to January 2004; and from May 2005 to June 2005. The father testified that he had been incarcerated for probation violations. The father testified that he currently works as a security guard earning $8.50 per hour.
The father acknowledged that he has a duty to support the children. He further stated that he is willing to pay the child-support arrearage. The evidence established that the father had not given the daughter any cards or gifts but that he had given the son one gift.
The case now before us commenced on August 25, 2004, when the mother petitioned the circuit court to direct the father to show cause why he should not be held in contempt for accruing an arrearage regarding his child-support obligation. She also petitioned for the termination of the father's parental rights. After the circuit court transferred the case to the Juvenile Division of the Montgomery Circuit Court ("the juvenile court"), the father counterclaimed seeking a judgment to enforce his visitation rights based on his alleged completion of the FIT program and to modify his child-support obligation.
After holding an ore tenus proceeding, the juvenile court entered a judgment on February 21, 2007. That judgment states, in pertinent part:
"The Court having considered same, it is hereby ORDERED, ADJUDGED, and DECREED as follows:
"1. That the Mother failed to meet the burden regarding the elements for Termination of the Father's parental rights, therefore her Petition is DENIED.
"2. That the Father's Petition for Visitation and to Establish Support is well taken and is due to be GRANTED. However, the Father's visitation will be facilitated by a counseling and parenting plan to be drafted by the Guardian ad Litem . . . and to be incorporated into future Order of this Court.
"3. That except as specifically modified herein or directly inconsistent *1202 herewith, the terms and conditions of all prior Orders of this Court shall remain in full force and effect."
The mother then timely appealed.
On appeal, the mother argues that the juvenile court erred in denying her petition to terminate the father's parental rights. However, the mother also submitted a letter brief to this court, arguing that the juvenile court's judgment is a nonfinal judgment. We, therefore, first consider the threshold issue of the finality of that judgment.
"`"It is well established that a final judgment is a `terminal decision which demonstrates there has been a complete adjudication of all matters in controversy between the litigants.'"'" Avondale Mills, Inc. v. Gallups, 949 So.2d 946, 947 (Ala.Civ.App.2006) (quoting Williams Power, Inc. v. Johnson, 880 So.2d 459, 461 (Ala.Civ.App.2003), quoting in turn Tidwell v. Tidwell, 496 So.2d 91, 92 (Ala.Civ.App. 1986)). Generally, this court lacks jurisdiction over an appeal if that appeal is from a nonfinal judgment and, therefore, must dismiss an appeal from a nonfinal judgment. See Hubbard v. Hubbard, 935 So.2d 1191, 1192 (Ala.Civ.App.2006) (citing Jim Walter Homes, Inc. v. Holman, 373 So.2d 869, 871 (Ala.Civ.App.1979)).
The circuit court had before it the mother's petition to direct the father to show cause why he should not be held in contempt for failure to pay his monthly child-support obligation and her petition seeking to terminate the father's parental rights. Because the juvenile court has exclusive original jurisdiction over proceedings seeking to terminate a parent's parental rights, see § 12-15-30(b)(6), Ala. Code 1975, the circuit court properly transferred the mother's termination petition to the juvenile court.
After the circuit court transferred the mother's termination petition to the juvenile court, the father then counterclaimed seeking a judgment to enforce his visitation rights and to modify his child-support obligation. Although the juvenile court purported to grant the father's counterclaim, it failed to completely dispose of the father's claim seeking visitation because, in its order, the juvenile court deferred completely adjudicating that claim pending submission of the guardian ad litem's "counseling and parenting plan." Furthermore, although the juvenile court purported to grant the father's claim seeking a modification of his child-support obligation, it failed to state a sum certain. However, for the reasons discussed below, we conclude that the juvenile court's failure to completely adjudicate the father's claims regarding matters of visitation and child support does not deprive this court of jurisdiction over the mother's appeal.
Subject to certain exceptions not applicable in the case now before us, "once a circuit court has acquired jurisdiction over a child pursuant to a divorce and decides the question of custody, that court retains jurisdiction over custody until the child reaches majority." P.R.G. v. W.P.R., 590 So.2d 913, 914 (Ala.Civ.App.1991); see also S.B.U. v. D.G.B., 913 So.2d 452, 455 (Ala.Civ.App.2005). In the case now before us, the circuit court acquired subject-matter jurisdiction over the issue of custody when it adjudicated that issue within its divorce judgment. Because the circuit court acquired subject-matter jurisdiction over matters of custody, it also acquired subject-matter jurisdiction over matters pertaining to visitation and child support. Consequently, the circuit court retained subject-matter jurisdiction over matters pertaining to custody, visitation, and child support. Because the circuit court retained subject-matter jurisdiction over *1203 those issues, we conclude that the juvenile court did not have subject-matter jurisdiction over the father's counterclaim seeking visitation and a modification of his child-support obligation. Accordingly, the juvenile court's judgment is void insofar as it purported to adjudicate matters pertaining to visitation and child support. See G.W. v. Dale County Dep't of Human Res., 939 So.2d 931, 934 (Ala.Civ.App.2006) (citing C.J.L. v. M.W.B., 868 So.2d 451, 454 (Ala. Civ.App.2003)) ("A judgment entered by a court that lacks subject-matter jurisdiction is void."). Because the juvenile court's judgment is void insofar as it purports to adjudicate the merits of the father's counterclaim, we reverse the judgment insofar as it purports to adjudicate that counterclaim and remand the cause with instructions to the juvenile court to vacate that portion of its judgment.
We now proceed to address the merits of the mother's appeal insofar as the juvenile court denied her petition to terminate the father's parental rights.
"This court's standard of appellate review of judgments terminating parental rights is well-settled. A juvenile court's factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong."
J.C. v. State Dep't of Human Res., [Ms. 2060091, October 12, 2007] ___ So.2d ___, ___ (Ala.Civ.App.2007) (citing F.I. v. State Dep't of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007)).
"`[The ore tenus] presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. "In child custody cases especially, the perception of an attentive trial judge is of great importance."'
"Ex parte Fann, 810 So.2d 631, 633 (Ala. 2001) (quoting Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981)). Also, this court `will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous.' Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996); see also Fitzner Pontiac-Buick-Cadillac, Inc. v. Perkins & Assocs., Inc., 578 So.2d 1061, 1063 (Ala.1991)."
A.A. v. Cleburne County Dep't of Human Res., 912 So.2d 261, 264 (Ala.Civ.App. 2005).
In Ex parte Beasley, 564 So.2d 950, 951 (Ala.1990), our supreme court stated: "[W]hen one parent seeks to terminate the other parent's parental rights, a `finding of dependency,' as a matter of law, is not required. . . ." Furthermore,
"[t]he two-prong test that a court must apply in a parental rights termination case brought by a custodial parent consists of the following: First, the court must find that there are grounds for the termination of parental rights, including, but not limited to, those specifically set forth in § 26-18-7[, Ala. Code 1975]. Second, after the court has found that there exist grounds to order the termination of parental rights, the court must inquire as to whether all viable alternatives to a termination of parental rights have been considered."
Id. at 954. Additionally, § 26-18-7 provides:
"(a) If the court finds from clear and convincing evidence, competent, material, and relevant in nature, that the parents of a child are unable or unwilling to discharge their responsibilities to and for the child, or that the conduct or *1204 condition of the parents is such as to render them unable to properly care for the child and that such conduct or condition is unlikely to change in the foreseeable future, it may terminate the parental rights of the parents. In determining whether or not the parents are unable or unwilling to discharge their responsibilities to and for the child, the court shall consider, and in cases of voluntary relinquishment of parental rights may consider, but not be limited to, the following:
"(1) That the parents have abandoned the child, provided that in such cases, proof shall not be required of reasonable efforts to prevent removal or reunite the child with the parents.
"(2) Emotional illness, mental illness or mental deficiency of the parent, or excessive use of alcohol or controlled substances, of such duration or nature as to render the parent unable to care for needs of the child.
"(3) That the parent has tortured, abused, cruelly beaten, or otherwise maltreated the child, or attempted to torture, abuse, cruelly beat, or otherwise maltreat the child, or the child is in clear and present danger of being thus tortured, abused, cruelly beaten, or otherwise maltreated as evidenced by such treatment of a sibling.
"(4) Conviction of and imprisonment for a felony.
"(5) Unexplained serious physical injury to the child under such circumstances as would indicate that such injuries resulted from the intentional conduct or willful neglect of the parent.
"(6) That reasonable efforts by the Department of Human Resources or licensed public or private child care agencies leading toward the rehabilitation of the parents have failed.
"(7) That the parent has been convicted by a court of competent jurisdiction of any of the following:
"a. Murder or voluntary manslaughter of another child of that parent.
"b. Aiding, abetting, attempting, conspiring, or soliciting to commit murder or voluntary manslaughter of another child of that parent.
"c. A felony assault or abuse which results in serious bodily injury to the surviving child or another child of that parent. The term `serious bodily injury' means bodily injury which involves substantial risk of death, extreme physical pain, protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty.
"(8) That parental rights to a sibling of the child have been involuntarily terminated.
"(b) Where a child is not in the physical custody of its parent or parents appointed by the court, the court, in addition to the foregoing, shall also consider, but is not limited to the following:
"(1) Failure by the parents to provide for the material needs of the child or to pay a reasonable portion of its support, where the parent is able to do so.
"(2) Failure by the parents to maintain regular visits with the child in accordance with a plan devised by the department, or any public or licensed private child care agency, and agreed to by the parent.
"(3) Failure by the parents to maintain consistent contact or communication with the child.
"(4) Lack of effort by the parent to adjust his or her circumstances to *1205 meet the needs of the child in accordance with agreements reached, including agreements reached with local departments of human resources or licensed child-placing agencies, in an administrative review or a judicial review.
"(c) In any case where the parents have abandoned a child and such abandonment continues for a period of four months next preceding the filing of the petition, such facts shall constitute a rebuttable presumption that the parents are unable or unwilling to act as parents. Nothing in this subsection is intended to prevent the filing of a petition in an abandonment case prior to the end of the four-month period."
Pursuant to § 26-18-3(1), Ala.Code 1975, "abandonment" is defined as:
"A voluntary and intentional relinquishment of the custody of a child by a parent, or a withholding from the child, without good cause or excuse, by the parent, of his presence, care, love, protection, maintenance or the opportunity for the display of filial affection, or the failure to claim the rights of a parent, or failure to perform the duties of a parent."
The mother argues that evidence of the father's loss of legal custody, his failure to exercise visitation with the children, and his failure to pay child support constituted clear and convincing evidence that the father is unable or unwilling to discharge his parental responsibilities to and for the children and is clear and convincing evidence that the father had abandoned the children.
The evidence is disputed regarding the father's attempts to maintain contact or communication with the children. The mother testified that the father had visited the children on two occasions before the parties' divorce and had telephoned her twice requesting to speak with the children. However, the father testified that, during the four years preceding the trial, he had attempted to contact the children more than 200 times. See M.C. v. L.B., 607 So.2d 1267 (Ala.Civ.App.1992) (affirming the denial of a petition to terminate a parent's parental rights when the evidence was disputed regarding the parent's communication or contact with the child).
Furthermore, although the evidence established that the father had not completed the FIT program until three and one-half years after the entry of the divorce judgment and although the father had subsequently failed to petition to exercise his visitation rights upon completion of that program, we do not conclude that that evidence requires this court to reverse the judgment. See B.R. v. M.M., 669 So.2d 982 (Ala.Civ.App.1995) (affirming the denial of a parties' petition to terminate a parent's parental rights when the parent had been awarded, but had failed to enforce, his visitation rights).
Regarding the father's child-support obligation, it is undisputed that the father had paid a total of only $299.69 in child support and that a child-support arrearage of between $14,000 and $15,000 had accrued. However, the juvenile court received evidence indicating that the father had been unemployed for a period due to an on-the-job injury. At other times, the father had been incarcerated for violating the terms of his probation, which was of his own volition. Nevertheless, this court has affirmed judgments denying a party's petition to terminate a parent's parental rights when that parent had failed to pay his or her child-support obligation. See B.R., 669 So.2d at 983 (affirming the judgment denying a termination petition when a parent had failed to pay his child-support obligation even though that parent had the financial means to tender such payments); *1206 see also S.M.W. v. J.M.C., 679 So.2d 256, 258 (Ala.Civ.App.1996) (affirming the judgment denying a mother's petition to terminate the parental rights of a father who had been incarcerated and had failed to pay his child-support obligation).
Furthermore, this court has considered evidence of acts of domestic violence in determining whether a parent is willing or able to discharge his or her parental responsibilities to and for a child. Cf. S.W. v. Houston County Dep't of Human Res., 854 So.2d 1146 (Ala.Civ.App.2002) (considering evidence of a perpetrator's acts of domestic violence against a parent when that parent's parental rights had been terminated). Regarding such acts in the case now before us, the mother and the children testified that the father had threatened the mother with a sword. However, that evidence is disputed; the father denied that he had threatened to kill the mother with a sword. Nevertheless, the father did not deny the mother's allegations that he had committed other acts of domestic violence. Moreover, the mother's and the children's testimony tended to establish that the father had committed acts of domestic violence in the presence of the children. However, the juvenile court could have concluded that the father's willingness to address his anger-management problem by seeking counseling rendered him able to control that problem.
Lastly, the juvenile court received the children's testimony regarding their desire not to have a relationship with the father. Regarding testimony of children, this court has previously stated: "[T]he [juvenile] court received ore tenus evidence and was in the best position to observe the child[ren] and the other witnesses while they testified and to evaluate their demeanor and credibility." J.S.M. v. P.J., 902 So.2d 89, 96 (Ala.Civ.App.2004). The juvenile court could have found credible evidence indicating that the mother had negatively influenced the children by making negative statements regarding the father.
We are mindful that this court cannot reweigh ore tenus evidence. See J.S.M., supra; and A.A., supra. In view of the evidence presented ore tenus, we affirm the juvenile court's judgment insofar as it denied the mother's petition to terminate the father's parental rights. We reverse the judgment insofar as it purported to adjudicate the merits of the father's counterclaim seeking to enforce his visitation rights and to modify his child-support obligation. We remand the cause with instructions to the juvenile court to vacate the portion of its judgment purporting to adjudicate those claims.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.
PITTMAN, THOMAS, and MOORE, JJ., concur.
BRYAN, J., concurs specially.
THOMPSON, P.J., dissents, without writing.
BRYAN, Judge, concurring specially.
I believe that the evidence presented would have supported a judgment terminating the father's parental rights. However, as an appellate court, we cannot sit in judgment of disputed evidence presented ore tenus. Therefore, I concur.
I believe that it is also important to note that in the event the father seeks to enforce his visitation rights in a court having subject-matter jurisdiction over that issue, this court's remand instructions do not require a court to grant a petition to enforce those rights.
NOTES
[1] The father testified that he later withdrew the plea of not guilty by reason of mental disease or defect.
[2] In addition to finding the father in contempt in its July 2003 judgment, the circuit court increased the father's child-support obligation to $317 per month.
[3] The mother also sought sole custody of the children in her contempt petition. The circuit court granted that request.
[4] The father testified that, during the three years preceding the trial, he had about four different jobs. He stated that he left one employer and began working elsewhere because he was paid a higher wage. He further testified that he had suffered an on-the-job injury in October 2005 and that, as a result, he had been unable to work. The father testified that his employment subsequently had been terminated during the time of his injury. The father's physician had given the father approval to return to work in June 2006.